J. Michael LIGHTNER, Acting Regional Director of Region 22 of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DAUMAN PALLET, INC., and Dauman Recycling, Inc., A Single Employer, Respondent.

Civ. A. No. 92–2316(JCL).

United States District Court,
D. New Jersey.

Sept. 4, 1992.

Marguerite R. Greenfield, N.L.R.B., Newark, NJ, for petitioner.

John Craner, Craner, Nelson, Satkin & Scheer, Scotch Plains, NJ, for respondents.

## MEMORANDUM AND ORDER

LIFLAND, District Judge.

This matter is before the court on a petition filed by the Acting Regional Director of Region 22 of the National Labor Relations Board (the "NLRB" or the "Board"), pursuant to § 10(j) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(j) for a temporary injunction pending the final disposition of this action. The filing of this petition follows the issuance of an unfair labor practice complaint pursuant to NLRA § 10(b), upon charges filed by Plastic, Metal, Trucking, Warehouse & Allied Workers, Local 132–98–102, International Ladies Garment Workers Union, AFL–CIO, (the "Union"), alleging that respondent Dauman Pallet Inc., and Dauman Recycling Inc., a Single

Employer ("Dauman"), has engaged in, and is engaging in, unfair labor practices within the meaning of §§ 8(a)(1), (3) and (5).

The NLRB asserts, *inter alia*, that Dauman has discriminated against Union employees by laying off and refusing to reinstate employees and assigning employees to more onerous duties because of their support for the Union, and that Dauman has refused to recognize and bargain with the Union concerning a unit of Dauman employees. Dauman has filed an answer to the Board's petition for injunctive relief along with a memorandum opposing such relief on the ground that the relief sought is not just and proper. Dauman concedes that the Board has reasonable cause to believe that the NLRA has been violated. The court will rely upon the administrative record and the testimony presented before this court. After review of the administrative record, the testimony before the court and the submissions of the parties, the court finds that injunctive relief would be just and proper, in order to effectuate the purposes of the Act. Therefore, the Board's petition for injunctive relief pursuant to § 10(j) will be granted.

## BACKGROUND

Respondent's business is two-fold. It engages in wooden pallet repairs and reconditioning, and its recycling operation grinds up unusable pallets and other wood products for sale as mulch and fuel. Respondent's main facility is located in Carteret. Until November 1, 1991, Respondent's main facility was located in Woodbridge. Respondent also has employees who repair pallets on site at a Pathmark warehouse in Woodbridge and a Rickel warehouse in South Plainfield.

According to the Certification of David Damiano, the principal of Dauman Recycling, Inc., the two operations were forced to move from Woodbridge to Carteret as a result of a court order evicting them from the Woodbridge site. According to that affidavit the Carteret site is substantially smaller than the Woodbridge site. This is the primary basis for defenses to many of the unfair labor practices alleged.

Prior to October of 1991, there was no Union presence within the respondent's operations. On October 21, 1991, two union organizers demanded recognition from Joseph Damiano, President of Dauman Pallet, Inc., and father of David Damiano. Respondent refused. On November 1, 1991, twenty-five employees were laid off. The Board contends this action was taken as a result of the ongoing attempt at unionization.

The administrative record reveals the following. Nehemias Alvarado, a Dauman employee, testified that in November of 1991, David Damiano and Peter DiMarco, a Dauman truckdriver, called him to meet at a diner. While at the diner, David Damiano asked Alvarado to leave the union in exchange for $10 an hour, paid vacations and holidays. (Administrative Transcript, p. 620) Alvarado further testified that on November 14, 1991, Joseph Damiano said the following:

—Alvarado would never drive a machine;

—All workers who went on strike would be forced to do piece work [1];

—forget about the Union, the Union isn't going to win because I have the best attorneys around;

—my attorneys have told me to call some workers back;

—workers who had not signed Union cards could work overtime, workers who had signed cards could only work forty hours;

(Administrative Transcript, pp. 624–26) Alvarado further testified that in two conversations in December Joseph Damiano said "if the union wins, all of the Hispanics [are] out" and he said "if you follow [a card signer], you, your children and your wife will be out in the street." (Administrative Transcript, pp. 631, 633).

Alvarado further testified that on June 3, 1992, the day before he was to take the stand before the Administrative Law Judge, Joseph Damiano approached him in the hallway outside the hearing room. Alvarado testified that Joseph Damiano told him that he would be transferred back to the yard (i.e. Carter-

---

1. Some employees were paid by the hour while others were paid by the "piece". Employees who did piece work were paid according to the number of pallets they repaired. The Board contends that piece work was more onerous.

et) from Pathmark if he refused to testify against the company. (Administrative Transcript, pp. 647–48). It is undisputed that the employees prefer working at the yard to working at Pathmark.

■ At the hearing before this court, Manuel Garcia testified credibly that supervisor Nicky Macrina told him that because he had signed a union card he would make $6.50 an hour rather than the $7.50 he had been making. Mario Mendoza testified credibly that David Damiano told him that Mendoza had "stabbed him in the back" and "double-crossed" him. Rhina Molina testified credibly as to the state of mind of various employees up through April 1992 resulting from the retaliatory statements and acts of representatives of Respondent; some employees were afraid or discouraged by those actions and one (Landeverde) was not only discouraged but convinced that those employees abandoning the Union were being treated better by the company.[2]

David Damiano also testified. He attributed the layoff which followed the request for recognition to the dismantling of the Montgomery grinder, a large piece of machinery operated by 25 employees. When cross-examined about this subject, he indicated unfamiliarity with the details of the dismantling and deferred to his father, Joseph Damiano. However, Joseph Damiano did not testify before me, and indeed in his Affidavit (¶ 5), Joseph Damiano refers to reduced demand and high inventory of repaired pallets as the cause of the November 1, 1991 layoff. This affected only pallet repair employees and the Montgomery grinder was recycling equipment, not pallet repair equipment. Thus, the credibility of David Damiano's testimony and certification are adversely affected. The court finds that the threats and continuing impact thereof testified to at the hearing before me are established.

**2.** Molina's testimony regarding the employees' statements is admissible to show the declarant's then existing state of mind, under Federal Rule of Evidence 803(3). Thus, the employees' statements that they feared employer retaliation is admissible to prove that they in fact feared retaliation, (see *United States v. Kelly*, 722 F.2d 873 (1st Cir.1983); *Detroit Police Officers' Ass'n v. Young*, 608 F.2d 671 (6th Cir.1979); *Oneonta*

## DISCUSSION

■ In order to grant injunctive relief, the court must find that petitioner has "reasonable cause to believe that the Act has been violated" and that the relief requested is just and proper. *Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874 (3d Cir.1990). For purposes of this application, respondent concedes that the petitioner can satisfy the "reasonable cause" element of the 10(j) inquiry. Therefore, the only question before the court is whether the relief requested is "just and proper".

■ The Third Circuit has stated that the relief requested is just and proper "where the passage of time reasonably necessary to adjudicate the case on its merits convinces both the Board and the federal courts that the failure to grant such relief might dissipate the effective exercise" of the Board's ultimate remedial power. *Kobell v. Suburban Lines, Inc.*, 731 F.2d 1076, 1091 (3d Cir.1984).

The court must address the issue of whether it is in the public interest to grant injunctive relief. The court has considered the public interest in the effectuation of the policies of the Act or the promotion of the remedial function of the Board. The court concludes that some of the relief sought by the petitioner in this instance is just and proper.

### Reinstatement

■ The Board presents this court with "the basic theory . . . that denial of reinstatement effectively denies employees the fruits of the collective bargaining process that otherwise would be available to them prior to ultimate reinstatement." *Kobell*, 731 F.2d at 1093. While the reinstatement of individual employees appears to be relief sought solely on behalf of those individual employees, it is clear that relief is "just and proper" if absent the injunctive relief requested, "the Board's

*Dress Co. v. N.L.R.B.*, 333 F.2d 1 (2d Cir.1964), but not to prove what caused the declarant's state of mind. See *United States v. Cohen*, 631 F.2d 1223 (5th Cir.1980). The statements related by Molina are not accepted to establish the employer acts which caused fear, but simply that the fear existed. That fear is highly relevant to the propriety of injunctive relief.

ability to facilitate peaceful management-labor negotiation will be impaired." *Vibra Screw, supra,* 904 F.2d at 879. Reinstatement is appropriate if the court finds that the termination of respondent's employees resulted in a "chilling effect" on co-employees.

■ Petitioner contends that as soon as respondent learned the identity of the Union's supporters, it discharged six of the card signers. Petitioner contends that this is conclusive evidence that the six employees were discharged as a result of their union activity. Most importantly, petitioner argues that if the former employees are ever to realize the benefits of collective bargaining, the status quo must be restored. Without the injunctive relief requested, the discharged employees will be forced to accept employment elsewhere and may be unwilling or unable to return to their former jobs should reinstatement be ordered by the Board. Finally, petitioner argues that reinstatement is crucial to restore employees' confidence in the bargaining process. *See Eisenberg v. Wellington Hall Nursing Home,* 651 F.2d 902 (3d Cir.1981).

While there is evidence in the record that both Damianos threatened union card signers, the present record does not support injunctive relief requiring reinstatement of the particular employees alleged to have been discharged for union activity. While the pending proceedings before the Board may ultimately and properly reach that result, there are enough disputed questions related to reinstatement of those employees to cause the court to be unable to conclude that their reinstatement at this time would be just and proper.

*Bargaining Order*

■ However, the court finds that an interim bargaining order is just and proper injunctive relief under the circumstances. In order for an interim bargaining order to be warranted, the court must find that at one point the union enjoyed a majority and that respondent engaged in pervasive and egregious unfair labor practices. In *NLRB v. Gissel Packaging Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court held that when an employer's unfair labor practices are extensive and egregious,

the court may count authorization cards to determine employee sentiment. The record in the present matter supports a finding that at one time the union did enjoy a majority. Forty-one cards were signed. The payroll of November 8, 1991 consisted of 73 employees, even including some that the Board contends were supervisors. The Board contends that the 73 employees includes all of the employees other than Joseph Damiano, David Damiano and an office employee. The record supports this contention, and therefore the conclusion that at one time the Union had a majority.

Additionally, the court finds that respondent's unfair labor practices were extensive and egregious. Twenty-four of seventy-three people on the payroll were temporarily laid off. There is reasonable cause to believe that many other serious violations occurred, as discussed above.

Petitioner argues that only through an interim bargaining order can the union's viability be maintained to the degree necessary to make a final Board adjudication in the Union's favor meaningful. The court agrees. In the present matter the respondent's anti-union conduct has continued unabated from discovery of the card signers until Joseph Damiano's actions during the hearing before the ALJ, and has apparently been successful in dissipating some support for the Union. Respondent's threats of future violations and the passage of time would continue to undermine union support if this court did not issue an interim bargaining order. The court notes that Dauman may insist as a condition of reaching agreement under the § 10(j) injunction that any labor contract be contingent on the Board upholding its asserted unit determination. Thus, on balance, the burden to Dauman in having to bargain in good faith does not exceed the harm which the current situation creates for the perception of the remedial powers of the Board and the effectuation of the purposes of the Act. Accordingly,

IT IS on this 4th day of September, 1992 ORDERED that Dauman, pending the final adjudication by the Board of the instant case, cease and desist from:

1. Laying off its employees, denying them reinstatement, reassigning them to more onerous positions, withholding overtime, or otherwise retaliating against employees or in any other manner discriminating against its employees because of their support for the Union.

2. Threatening its employees with discharge, layoff, the closing of its facility and other reprisals if they engaged in activities on behalf of the Union.

3. Interrogating employees concerning their activities on behalf of the Union.

4. Threatening not to bargain with the Union should its employees select it as their bargaining representative.

5. Promising increased benefits, wage increases and better terms and conditions of employment if they rejected the Union as the collective bargaining representative.

6. Failing or refusing to recognize and bargain with the Union as the exclusive collective bargaining representative of Respondent's employees at its Carteret and Woodbridge facilities including employees assigned to its Woodbridge-Pathmark and South Plainfield-Rickel's locations.

7. In any other manner interfering with restraining or coercing its employees in the exercise of their statutory rights.

It is further ORDERED that Dauman take the following affirmative action:

1. Recognize, and, upon request, bargain in good faith with the Union as the exclusive representative of its production and maintenance employees at its Carteret, Woodbridge and South Plainfield locations.

2. Post copies of the Court's opinion and order in both Spanish and English at locations in its Carteret, Woodbridge and South Plainfield, New Jersey facilities where notices to employees are normally posted.

3. Within thirty days of the entry of the Court's order, submit to the Court, with a copy to Petitioner, an affidavit from a responsible official of Respondent which describes the specific actions taken by Respondent to comply with the Court's order.